1 | **GARCIA, ARTIGLIERE & MEDBY**
**Stephen M. Garcia, State Bar No. 123338**
2 |   sgarcia@lawgarcia.com
**David M. Medby, State Bar No. 227401**
3 |   dmedby@lawgarcia.com
**One World Trade Center, Suite 1950**
4 | **Long Beach, California 90831**
**Telephone: (562) 216-5270**
5 | **Facsimile: (562) 216-5271**

6 | Attorneys for Plaintiff and Proposed Class
Members
7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA**

10 | **SAN FRANCISCO DIVISION**

11 |

12 | TARA SHAIA, individually and on behalf of
others similarly situated,

13 |                    Plaintiff,

14 |          vs.

15 | HARVEST MANAGEMENT SUB, LLC,

16 |                    Defendant.

17 |

CASE NO. 4:14-CV-4495 PJH

**MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION**

Date:     August 3, 2016
Time:     9:00 a.m.
Dept.:    3

18 |

19 |          **TO DEFENDANT AND THEIR ATTORNEYS OF RECORD:**

20 |          PLEASE TAKE NOTICE that on August 3, 2016, at 9:00 a.m. in Courtroom 3 located on the

21 | 3rd Floor of the courthouse located at 1301 Clay Street, Oakland, CA 94612, Plaintiffs Tara Shaia and

22 | Eric Parker will and hereby do, pursuant to *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 486 (1989)

23 | and *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111 (N.D. Cal. 2011), move this

24 | Court to decertify the collective conditionally certified on April 13, 2015 on the following grounds:

25 | (1) disparate factual settings favor decertification; (2) the various defenses available to Defendant,

26 | including the executive, administrative, professional, and tacking exemptions, favor decertification;

27 | and (3) fairness and procedural considerations favor decertification.

28 |

*Vertical left margin text:* **GARCIA, ARTIGLIERE & MEDBY** ONE WORLD TRADE CENTER, SUITE 1950 LONG BEACH, CALIFORNIA 90831 TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1    This Motion is based on the this Notice of Motion and Motion, the Declarations of Tara Shaia,

2  Eric Parker, Andrew Lindquist, Heather Bowers, Eric Naftzger, Kim Antle-Petrides, Dani Alon, Chris

3  Colby, Darrell Aoki, and Shelly Buchholz, the Proposed Order, the papers on file in this action, any

4  fact that is judicially noticeable, and the arguments of the parties at the hearing on this Motion.

5

6  DATED: June 24, 2016                    **GARCIA, ARTIGLIERE & MEDBY**

7

8

9                                      By:    /s/ David M. Medby

10                                          Stephen M. Garcia
                                           David M. Medby
11                                          Attorneys for Plaintiff and Proposed Class Members

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.    INTRODUCTION ............................................................................................................ 1

II.   BACKGROUND .............................................................................................................. 2

      A.    Holiday's Business .............................................................................................. 2

      B.    Holiday's Food Services Program ...................................................................... 3

      C.    The Executive Chef Position .............................................................................. 3

            1.    Executive Chef's Basic Job Duties ....................................................... 4

            2.    Variance In Management And Administrative Duties ........................... 5

            3.    Variance In Personnel Management Among Executive Chefs .............. 7

            4.    Variance In Discretion Exercised By Executive Chefs ......................... 8

            5.    Variance In Education And Training Of Executive Chefs ..................... 8

      D.    Plaintiff Tara Shaia ............................................................................................. 9

      E.    Arbitration, Collective Action Waivers, and Settlement Agreements Entered
            Into By Many Executive Chefs Prevent Participation In This Case ................... 9

            1.    Arbitration Agreements ......................................................................... 9

            2.    Settlement Agreements ....................................................................... 10

III.  PLAINTIFF'S LAWSUIT AND PROCEDURAL HISTORY .................................... 11

IV.   LEGAL STANDARD ................................................................................................... 12

V.    ARGUMENT ................................................................................................................. 13

      A.    Different Factual Settings Favor Decertification ............................................. 13

      B.    Individualized Exemption Defenses Favor Decertification .............................. 15

      C.    Evaluating The Executive Exemption Requires Individualized Inquiries ......... 17

            1.    Individualized Inquiries Are Required To Assess Whether Executive
                  Chefs Have A Primary Duty Of Management ..................................... 17

            2.    Individualized Inquires Are Required To Assess Whether Executive
                  Chefs Have The Ability To Make Personnel Decisions - Particular
                  Weight ................................................................................................. 18

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION

D.     Evaluating The Administrative Exemption Requires Individualized Inquiries ...... 19

      1.     Individualized Inquires Are Required To Determine Whether The Employee Primarily Performs Administrative Duties ................................ 19

      2.     Individualized Inquiries Are Required To Determine Whether Executive Chefs Exercise Independent Judgment And Discretion ............. 20

E.     Evaluating The Professional Exemption Requires Individualized Inquiries .......... 21

F.     Evaluating The Tacking Defense Requires Individual Inquires ............................. 22

G.     Fairness And Procedural Considerations Counsel Towards Decertification .......... 22

VI.     CONCLUSION ................................................................................................. 24

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.toa.tocdocx.docx

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Anderson v. Cagle*
    488 F.3d 945 (11th Cir. 2007) ............................................................. 13

*Beauperthuy v. 24 Hour Fitness USA, Inc.* ............................................... passim

*Green v. Harbor Freight Tools USA, Inc.*
    888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) ....................................... 15

*Hernandez v. United Auto Credit Corp.*
    2010 WL 1337702 at *1 (N.D. Cal. 2010) ............................ 14, 15, 23

*Hill v. R + L Carriers, Inc.*
    2011 WL 830546 at *1 (N.D. Cal. 2011) ..................... 14, 15, 16, 17

*Hoffman-La Roche v. Sperling*
    493 U.S. 165 ....................................................................... 1, 12

*Leuthold v. Destination America, Inc.*
    224 F.R.D. 462 (N.D. Cal. 2004) ............................................... 12

*Reed v. County of Orange*
    266 F.R.D. 446 (C.D. Cal. 2010) ............................................... 13

*Santiago*
    2013 WL 5444324 at *6-8 ........................................................ 16, 17

<u>Statutes</u>

.  29 C.F.R. § 541.301(a) ....................................................................... 21

29 C.F.R. § 541.100(a) ................................................................ 17, 18

29 C.F.R. § 541.102 ............................................................................ 18

29 C.F.R. § 541.200(a)(1)-(3) .......................................................... 19

29 C.F.R. § 541.201(a) ...................................................................... 19

29 C.F.R. § 541.202(a) ...................................................................... 20

29 C.F.R. § 541.202(b) ...................................................................... 20

29 C.F.R. § 541.202(c) ...................................................................... 20

29 C.F.R. § 541.300 (a) ..................................................................... 21

29 C.F.R. § 541.301(b) ...................................................................... 21

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

4:14-CV-4495 PJH

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.toa.tocdocx.docx

29 C.F.R. § 541.301(c) .................................................................................................. 21

29 C.F.R. § 541.301(d) .................................................................................................. 22

29 C.F.R. § 541.301(e)(6) ............................................................................................. 21

29 C.F.R. § 541.708 .............................................................................................. 16, 22

29 U.S.C. § 213(a)(1) .................................................................................................... 19

29 U.S.C. § 216(b) ........................................................................................................ 12

**GARCIA, ARTIGLIERE & MEDBY**

ONE WORLD TRADE CENTER, SUITE 1950

LONG BEACH, CALIFORNIA 90831

TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION

M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.toa.tocdocx.docx

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   <u>INTRODUCTION</u>

Plaintiffs filed this case alleging that Defendant Harvest Management SUB LLC ("Holiday" or the "Company") misclassified all Executive Chefs in Holiday's senior living communities across America. Plaintiffs' complaint maintains that the Chefs should not be classified as exempt from overtime.

During the period of time after the Court granted Plaintiffs' motion for conditional certification about a year ago, Plaintiffs have discovered facts and evidence that have led them to conclude that this case is not appropriate for class treatment. There are substantial differences among the class. Further, the very small number of potential opt-in Chefs that can participate in this case – only *fourteen* including named Plaintiffs nationwide out of over 800 possible participants – creates a significant "numerosity" problem. Plaintiffs consequently move this Court to decertify the conditionally certified FLSA collective.

Plaintiffs have learned of a number of variances among Executive Chefs that impact major issues in this case. For instance, the way different Chefs do their jobs significantly vary based on geography, regional management, community, community management, and skill. These variations impact the duties that Executive Chefs perform, which in turn impact how Holiday's exemption defenses will be adjudicated. They necessitate individual inquiries predominantly.

Due to these variables, Executive Chefs engage in different amounts of management and administrative duties. Such varying duties include:

- personnel management,
- directing and planning work,
- training,
- scheduling,
- purchasing,
- budgeting, and
- concurrent management and non-management work (such as supervising while cooking).

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

Executive Chefs also employ varying amounts of discretion and independent judgment in performing their duties. In areas of employee supervision, running kitchen operations, menu planning, adhering to company guidelines, and personnel decisions, discretion and independent judgment are critical ingredients. And, yet, the evidence demonstrates that while some Chefs embrace these duties to the extent of micro-management, others tend to delegate them and still others are less proficient at them or do not do them at all. Variations exist within this scale, too, with some Chefs excelling at some tasks requiring discretion/independent judgment while rating "needs improvement" on others. In short, the evidence in this lynchpin issue is all over the map.

Decertification is appropriate for three main reasons. First, each Chef does his or her job differently. The varying factual scenarios for Executive Chefs favor decertification. Their job duties differ and there is no common policy requiring primarily non-exempt work that would prove liability on a class-wide basis.

Second, the differing factual scenarios among Executive Chefs require individualized inquiries as to the application of the executive, administrative, and professional exemption defenses. These three separate affirmative defenses require fact-intensive evaluations when analyzed by themselves. Here, however, different Chefs have different exemptions that apply to them in differing degrees, causing a tumbleweed of evidentiary and legal tangles that are inappropriate to resolve in a single trial. Decertification is appropriate in that scenario.

Third, procedural, jury confusion, and fairness considerations also favor decertification. Collective adjudication would be inefficient due to the differences among class members and prejudicial to both the named Plaintiffs and Defendants. There are also not many Chefs that can participate in this action because of arbitration agreements, settlement agreements, and collective action waivers. There is no trial plan that would harmonize these constituent parts into a single whole.

Accordingly, the Court should grant Plaintiffs' motion and decertify the collective.

## II.   BACKGROUND

### A.   Holiday's Business

Holiday currently operates approximately over 300 independent senior living communities throughout the United States. A major service it provides to residents is in-house dining.  Holiday

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

1 provides its residents with three meals per day, breakfast, lunch, and supper. (Lindquist Decl. at ¶3.)

2 Significantly, Holiday considers the dining room (i.e., the Executive Chef's domain) to be the focal

3 point of its residents' lives and a center point of each community's social fabric. (*Id.*)

### B.   Holiday's Dining and Hospitality Program

5 Holiday's dining and hospitality program run by Executive Chefs is a critical part of its

6 business and sales strategy. (Lindquist Decl. at ¶4.) As part of its focus on senior living, Holiday's

7 Executive Chef must organize and deliver three nutritional meals a day utilizing a team of co-

8 professionals and staff. (Lindquist Decl. at ¶5.) The meals address the specific dietary needs for

9 seniors with menus rich in Vitamins B6, B12, C, D, E, B6, Zinc, Calcium, Beta Carotine, Folate, and

10 Water. (*Id.*) Seniors are given broad food choices with these nutrients to boost immune systems,

11 increase calcium intake and absorption, reduce oxidation, support cardiovascular health, improve

12 memory, promote clear thinking, and reduce dehydration — all issues with which seniors have unique

13 sensitivities. (*Id.*)

### C.   The Executive Chef Position

15 The position and the duties performed by each Chef varies in several respects, including by

16 geographic region, community size, supervision, and the individual skill set of the Executive Chef.

17 Most Chefs, but not all, are in charge of the entire food service program at their community. Providing

18 dining services to Holiday's residents is a team effort led by the Chef. (Lindquist Decl. at ¶6.) The job

19 titles managed by the Executive Chef are: Sous Chef, Cook, Prep Cook, Kitchen Helper, Dishwasher,

20 and Food Server. (*Id.*) The team ensures that food is prepared and served to residents in a timely, safe

21 and quality manner. (*Id.*)

22 At some communities, the Community Managers oversee the service staff, instead of the

23 Executive Chef. (Lindquist Decl. at ¶6.) In that way also management responsibilities vary from place

24 to place.

25 Executive Chefs are frequently part of the community Management Team, but not always

26 depending on local dynamics. (Lindquist Decl. at ¶7.) This team is comprised of other senior

27 employees at the Holiday community, such as the Community Managers, who together manage the

28 property. (*Id.*)

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

### 1. Executive Chef's Basic Job Duties

The written job description for Executive Chefs requires them to perform high-level managerially exempt duties. (Lindquist Decl. at ¶8, Ex. A.) Indeed, Holiday written job description requires Executive Chefs to demonstrate leadership and managerial skills necessary to: (1) direct the food service staff in all areas of food service; (2) ensure proper food preparation with exceptional taste and outstanding preparation; (3) ensure preparation of foods for residents' special dietary requirements; (4) ensure proper food inventory; (5) promote and operate clean and sanitary kitchen and dining room areas; and (6) operate within budget. (*Id.*) More specifically, according to the written job description, Holiday expects Executive Chefs to perform the following essential duties and responsibilities, among others:

- Hire, train, and develop new employees;
- Schedule hours, breaks, and meal periods of subordinate employees;
- Engage in performance management, discipline, and termination of food service employees;
- Operate the Food Service Department within the food and labor budget through careful planning, purchase of food supplies;
- Plan all food preparation, including menus, and exercise judgment in monitoring content of menus;
- Control food quality and prepare nutritious, appetizing, and attractive meals;
- Employ skills and imagination in making mealtimes enjoyable for residents, food presentation, and creative use of leftovers;
- Assist with food preparation and service on an ongoing basis, while continually managing employee performance and monitoring resident satisfaction;
- Maintain timely and accurate administrative documentation and submission of reports and invoices regarding the budget; and
- Participate in weekly Management Team meetings.  (*Id.*)

In terms of qualifications, the Holiday written job description requires that Executive Chefs possess the following characteristics:

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

- A Culinary Arts Degree and/or Chef Certification or equivalent work experience;
- Two-years of experience in hands-on food preparation/presentation or five years in high volume and fine dining experience;
- Strong management skills;
- Demonstrated experience in supervising staff and working in a team setting; and
- Certification of ServeSafe Hazard Analysis Critical Control Point.

(Lindquist Decl. at ¶8, Ex. A.) Holiday requires its Executive Chefs to sign the job description to acknowledge that they understand these many duties. (Lindquist Decl. at ¶9.)

While the written job description for all Chefs is the same, the actual job duties performed and the way they perform those job duties distinguish them from one another and are very different. Key variables such as geography, community size, regional management, community management, and Chef skill all impact what job duties the Executive Chefs actually perform. These variables also influence how much time they spend on certain duties, and not others, which creates even more variables.

**2.      Variance In Management And Administrative Duties**

There are significant variances in the amount of management and administrative duties performed by Chefs, from little or no involvement to significant involvement. For example, depending on community, Chefs have different amounts of involvement and different styles in how they train their kitchen staff. (Antle-Petrides Decl. at ¶6 [discussing training on pureed foods], ¶8 ["To help run an efficient kitchen, I have drafted what I consider to be 'the rules of the kitchen.'"].)[1] Others have less involved training methods. (*See*, Parker Decl. at ¶9 [trains employees by watching them and

---

[1] Alon Decl. at ¶11 & 12 ("One important aspect of managing the servers is ensuring that they use proper plate ware and utensils as required by Kosher rules. . . . Rabbi White and I work together to continually educate and train our kitchen staff in operating a Kosher kitchen.  No one else does this."); Colby Decl. at ¶11 (". . . one of my tasks was to improve efficiency and quality of the kitchen operations.  To accomplish this, I drafted timelines for the kitchen staff which allowed the staff to work smarter. . ."); Buchholz Decl. at ¶9 (discussing training she designed).

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950

LONG BEACH, CALIFORNIA 90831

TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1   giving instruction as needed]; Shaia Decl. at ¶5 [procedures followed are issued at the corporate

2   level].)

3        Executive Chefs also use their discretion and creativity in different ways to develop entrées

4   and menus. Many Executive Chefs, but not all, develop unique entrée choices independently. For

5   example, one Chef in Walla Walla, Washington has designed s substantial vegetarian menu to

6   accommodate that community's sizable Seventh Day Adventist population. (Neftzger Decl. at ¶4-6.)

7   Another Chef in Hawai'i prefers not to follow Holiday's menu suggestions and instead serves meals

8   that "honor the cultural heritage and flavor of the Hawai'ian islands." (Aoki Decl. at ¶4-5.) And

9   another Chef in Florida makes significant changes to Holiday's suggested menus and chooses to serve

10  an entirely Kosher menu and works with a rabbi in doing so. (Alon Decl. at ¶¶5-6.)  Still others

11  incorporate pureed foods into their menus, instead of following the suggested menus. (Id. at ¶8; Antle-

12  Petrides Decl. at ¶6.) And another Chef runs his kitchen "restaurant style" — where residents can

13  request a made-to-order meal and results in double the regular menu offerings from Holiday's

14  suggested items. (Colby Decl. at ¶6.)

15       Other Chefs do not act so independently and do not vary their menus much. But there is still

16  some variance among these chefs. For example, some chefs run a different style of kitchen that does

17  not allow for much variance, such as a buffet-style kitchen. (See, Buchholz Decl. at ¶¶4-5 [buffet style

18  with minimal menu options or alternate choices].) Others have been told that they must follow

19  Holiday's guidelines. (See, Parker Decl. at ¶10 [manager limited ability to work outside the menu],

20  ¶19 [required to serve particular type of food and no choice in menu selection]; Shaia Decl. at ¶5.)

21  They typically follow the menu generated by the corporate office, and so use less discretion than their

22  peers on this job duty. (Parker Decl. at ¶19 [discretion taken away on menus].)

23       Similarly, there is variance in the level of direction of and planning for the kitchen staff. Most

24  of the variance occurs naturally with the Chef's menu choices. Those Chefs who vary their menus

25  more also make more choices engage in more independent planning of their menus (and their staff's

26  work along with it). (See, Alon Decl. at ¶¶4, 6, 11, 12 [discussing impact of Kosher menu on running

27  the kitchen]; Antle-Petrides Decl. at ¶6 [discussing pureed foods work]; Colby Decl. at ¶7 [discussing

28  constant cooking by staff based on restaurant-style.]) Conversely, Chefs that vary their secondary

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION

M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1   menus less engage in less planning and direction, but they still plan the work of their staff, albeit

2   differently. (Buchholz Decl. at ¶6 [discussing kitchen staffing and instruction].)[2]   Other Chefs who

3   strictly adhere to company guidelines also engage in less planning and direction. (Shaia Decl. at ¶5.)

4        Consistent with their menu choices, Executive Chefs spend different amounts of time and may

5   take different roles with respect to controlling budgets and the purchase of food. For example, those

6   with more unique menus make different choices with respect to staying within their food and labor

7   budgets. (Aoki Decl. at ¶6 [use of local vendors for Hawai'ian food makes budgeting unique], ¶15

8   [controlling overtime]; Alon Decl. at ¶7, 13 [same re: Kosher food vendors and managing overtime];

9   Colby Decl. at ¶¶8, 9 [same re: restaurant style kitchen and efficient kitchens].) But others think very

10  little about their budgets and food purchases given their adherence to Holiday's suggested menus.

11  (Parker Decl. at ¶19 [claims minimal menu variation reduced ability to manage budget and food

12  costs].) Still others have no involvement in budgeting. (Shaia Decl. at ¶9 [claims her budget entirely

13  set at corporate level].)

14       Chefs also vary the amount of cooking they do by community. Some Chefs spend very little

15  time cooking. (Alon Decl. at ¶9 [30-60 minutes daily]; Antle-Petrides Decl at ¶9 [25% cooking]; Aoki

16  Decl. ¶9 [50% cooking, but simultaneously supervising staff]; Colby Decl. at ¶9 [less than 50% time

17  cooking, often less].) But others choose to spend a lot of time cooking, often because they like it—not

18  because it is a job requirement to cook a lot. (Buchholz Decl. at ¶9 [70-75% cooking and managing

19  the kitchen because she enjoys it]; Neftzger Decl. at 11 [majority of time spent cooking and managing

20  kitchen]; Parker Decl. at ¶5 [70% of time worked spent doing line cook duties].)

21       **3.   Variance In Personnel Management Among Executive Chefs**

22       The amount of involvement Executive Chefs have in personnel management varies from Chef

23  to Chef. Some Chefs  make all the hiring decisions for their kitchen staff and do all the performance

24  management decisions, such as hiring, promotions, discipline, and terminations. (Alon Decl. at ¶11;

25  Antle-Petrides Decl. at ¶7; Colby Decl. at ¶10.)

---

26

27  [2] *See also*, Parker Decl. at ¶9 (management style "watching" and instruction as needed), ¶19 (following corporate generated menu).

28

1    And other Chefs sometimes involve other parties when making those decisions, but still have

2    the ultimate say in personnel decisions. (Aoki Decl. at ¶¶11-13 [involving HR for discipline]; Neftzger

3    Decl. at ¶12 [involving employee relations as necessary]; Buchholz Decl. at ¶10 [involving

4    community managers when needed].)

5    Still others worked in communities where their superiors (a regional chef, community

6    manager, or higher) had to approve or make personnel decisions. (Parker Decl. at ¶¶2-3 [Regional

7    Chef making hiring decisions], ¶¶4,17 [discipline and termination required approval]; Shaia Decl. at

8    ¶4 [rate of pay set at corporate level]; ¶8 [limited authority in handling grievances and must refer

9    complaints to HR]; ¶9 [cannot discipline employees other than performance documentation].)

**4.   Variance In Discretion Exercised By Executive Chefs**

11    Executive Chefs also exercise different amounts discretion in performing their job duties. One

12    example is the amount of reliance a Chef places on the Holiday suggested menus. The differences in

13    Executive Chef's menu choices also impact the amount of discretion they use. As mentioned in more

14    detail above, some Chefs do not vary their secondary menu choices very much. (*See*, Buchholz Decl.

15    at ¶¶4-5; Parker Decl. at ¶19.) And others change up their secondary menus quite a bit. (*See*, Alon

16    Decl. at ¶6; Antle-Petrides Decl. at ¶7; Naftzger Decl. at ¶4; Colby Decl. at ¶6; Aoki Decl. at ¶4-5.)

17    There are other areas where discretion varies as well. These menu choices influence the

18    decisions Chefs make in ordering food and supplies and affect the way Chefs control their budgets.

19    (*See*, *supra*, section (II)(C)(2).) It also impacts training programs created by Chefs. (*Id*.) And the

20    variance in the amount of involvement and authority Chefs have with respect to personnel issues also

21    creates variance in the amount of discretion exercised by Chefs as well as those issues require that

22    Chefs make independent choices on how to handle each situation. (*See*, *supra*, (II)(C)(3).)

23    All of these variances in the way Chefs perform their jobs lead to a range of exempt vs. non-

24    exempt possibilities for each Chef.

**5.   Variance In Education And Training Of Executive Chefs**

26    Holiday's Executive Chefs also have a variety of professional backgrounds. This is because

27    the Company written job description requires a culinary degree or the equivalent experience to be

28    hired into the position. (Lindquist Decl. at ¶8, Ex. A.) Some Executive Chefs have culinary degrees.

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

4:14-CV-4495 PJH

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  (Parker Decl. at ¶20; Naftzger Decl. at ¶3; Antle-Petrides Decl. at ¶3; Alon Decl. at ¶3) but others
2  meet this requirement through independent training and work experience. (Colby Decl. at ¶3 [school
3  and work training]; Aoki Decl. at ¶3 [on-the-job training]; Buchholz Decl. at ¶3 [same].) The
4  differences in schooling and experience relate directly to the "professional exemption" affirmative
5  defense.

6  **D.    Plaintiff Tara Shaia[3]**

7  Shaia is a current Executive Chef at the Holiday's Bay Park Community in Pinole, California.
8  She has been employed there continuously for over a decade. She has a Culinary Arts Certificate from
9  Contra Costa College. She also holds an Artistic Food Presentation Certificate from the California
10 Culinary Academy.

11 Because of the job duties set forth in the Holiday written job description, Shaia was classified
12 as exempt from overtime. She is considered by her managers as a high performer and a skilled
13 Executive Chef. In May 2014, after Holiday re-classified California Executive Chefs to be non-
14 exempt, Shaia sent Holiday's management an email indicating that in the six to eight month period
15 prior to sending the email she often completed her work in 40 hours, without incurring any work time
16 which would be considered overtime had she been non-exempt, and engaged in effective training,
17 cross-training, and management of her staff. (Shaia Decl. at ¶3, Ex. 1.)[4]

18 **E.    Arbitration, Collective Action Waivers, and Settlement Agreements Entered Into**
19 **By Many Executive Chefs Prevent Participation In This Case**

20 **1.    Arbitration Agreements**

21 Holiday instituted an arbitration program for all of its employees. The only members of the
22 putative class who are *not* bound by the agreements are those Executive Chefs whose employment
23 terminated prior to the start of the arbitration program or those few incumbent employees who
24 affirmatively opted-out of the program.

25

26 [3] Plaintiff Eric Parker is not a named plaintiff on the FLSA claims, but did file an opt-in.

27 [4] Prior to that time period, she often worked more than 40 hours per week. (Shaia Decl., at ¶3.)

28

The arbitration agreements mandate arbitration of all employment-related disputes and contain a broad class action waiver clause. Approximately 67% of the conditionally certified FLSA collective are bound by these agreements. (Bowers Decl. at ¶5.)

The arbitration agreement states (in original CAPITALIZATION and **bolding**):

. . . By entering into this Agreement, you ("**Associate**") and the Company are **WAIVING THE RIGHT TO A JURY TRIAL** for all disputes arising out of, or related to, the employment relationship and are **WAIVING THE RIGHT TO PURSUE, OR PARTICIPATE IN, ANY CLASS OR OTHER FORM OF OTHER REPRESENTATIVE ACTION** concerning these types of disputes .

The agreement continues:

The Company and Associate hereby agree that ***any dispute*** between Associate and the Company . . . that ***is related to, arises from, or is in connection with Associate's employment*** . . . with the Company, must be submitted for resolution by mandatory, binding arbitration.  (*Id*. at ¶4, Ex. B[emphasis added].)

Executive Chefs entered into this agreement in two ways. Some executed agreements as part of their hiring process. Others did not opt-out of the arbitration agreement when it was rolled out to incumbent employees.

### 2.     Settlement Agreements

Also mentioned by Holiday in its opposition to conditional certification, after this lawsuit was filed, Holiday instituted a limited settlement campaign targeting only the putative California Class. These settlement agreements impacted only a handful of the opt-in Plaintiffs. Each agreement contains a collective action waiver (Bowers Decl. at ¶3, Ex. A.)

More specifically, the California Executive Chefs released "any and all causes of action," known or unknown, that they may have had against Holiday. In addition, Executive Chefs also agreed to facilitate the settlement by affirming its validity before a court. They also agreed not to participate in this action. That clause says:

2(c).   **Promise Not to File Lawsuit or Administrative Action or Participate in Class, Collective, or Representative Action**.  You agree not to file any lawsuit or administrative complaint about any Claims released by this Agreement, except that you may file any administrative complaints for which you do not seek monetary recovery. ***You further agree not to participate in any representative lawsuit that asserts any of the Claims released by this Agreement***. (Bowers Decl. at ¶3, Ex. A.)

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

The collective action waiver in this release and at least one other release precludes 5 opt-in Chefs from participating in the collective action. (Bowers Decl. at ¶5.)

## III.    PLAINTIFF'S LAWSUIT AND PROCEDURAL HISTORY

Plaintiffs allege that Holiday misclassified them and all other Executive Chefs nationwide as exempt from overtime under the FLSA. [ECF No. 22.]

The collective Plaintiffs seek to represent consists of:

all persons who were, are, or will be employed by [Holiday] nationwide as Executive Chefs at any time within the three years prior to the filing of this complaint through the date of the final disposition of this action . . .

On April 13, 2015, the Court granted Plaintiffs' motion for conditional certification. [ECF No. 55.] In doing so, the Court noted that the evidence was "thin," but sufficient to grant conditional certification under the relaxed standard applied at that stage. [*Id.* at 11.] The Court ordered the parties to meet and confer as to the notice to be sent and ordered Holiday to provide Plaintiff with the putative class contact information within 14 days of the Court-approved notice. [*Id.* at 12-14.]

The Parties submitted their agreed-upon notice on May 1, 2015. [ECF No. 57.] The Court approved that notice on May 4, 2015 and ordered that the notice be sent out by June 30, 2015.  [ECF No. 58.] The Parties' stipulated to delay sending the notice until July 15, 2015 to account for a pending mediation. The Court approved that stipulation on June 19, 2015. [ECF Nos. 59, 61.]

Holiday provided Plaintiffs with the contact information and Plaintiff's sent out the notice to over 800 Executive Chefs. After Plaintiff sent out the notice, 64 Executive Chefs (including Plaintiffs) filed opt-in notices by the September 14, 2015 deadline. (Bowers Decl. at ¶5.) Of the total 62 opt-in plaintiffs, 43 entered into arbitration agreements that contained the above-mentioned collective action waiver. (*Id.* at ¶¶4-5.) Six of the opt-in plaintiffs entered into a settlement agreements that contained collective action waivers or other releases, but three of those individuals also have arbitration agreements or are time-barred, so a net of three additional Chefs cannot participate. (*Id.* at ¶¶3 & 5.) And four opt-in Chefs worked no weeks within the statute of limitations period, but one of those Chefs had an arbitration agreement, so there is another additional net of three Chefs who cannot participate. (*Id.* at ¶5) **As a result, only 14 Executive Chefs can participate in this action. Only**

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA  90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  **Plaintiffs Shaia and Parker are from California, and the remaining 12 Chefs are from  states**

2  **spread across the country.**  (*Id.*)

3  The Parties have exchanged written discovery, consisting of document requests,

4  interrogatories, and declaration testimony exchange. In addition, the Parties exchanged significant

5  information informally in anticipation of a mediation. Although the mediation was not successful, the

6  Parties have continued to exchange information as part of their on-going discussions to resolve this

7  matter. Based on the information exchanged and discovery to date, Plaintiffs believe that this case

8  should be decertified.

9  **IV.   LEGAL STANDARD**

10  Under the FLSA, employees may bring a collective action against an employer on behalf of

11  themselves and other employees similarly situated.  29 U.S.C. § 216(b).  But neither the FLSA, the

12  Ninth Circuit, nor the Supreme Court have defined the term "similarly situated." *Beauperthuy v. 24*

13  *Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1117 (N.D. Cal. 2011). However, the Supreme Court

14  did indicate that a proper collective action encourages judicial efficiency by addressing, in a single

15  proceeding, claims of multiple plaintiffs who share common  issues of law and fact arising from the

16  same alleged prohibited activity.  *Id* (citing *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 486 (1989).)

17  District courts in the Ninth Circuit, including courts in the Northern District, have used a two-

18  part approach in assessing whether employees are similarly situated.  *Leuthold v. Destination*

19  *America, Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004). Whether a case may proceed as a collective

20  action is within the discretion of the trial court.  *Beauperthuy*, 772 F. Supp. 2d at 1117.  But that

21  discretion is not unbridled.  *Hoffmann-LaRoche, Inc.*, 493 U.S. at 174.

22  At the first stage, as the Court did in this case, the district court may approve conditional

23  certification upon a minimal showing that the proposed class members are "similarly situated."

24  *Leuthold*, 224 F.R.D. at 467. The second step is more stringent, and usually upon a motion for

25  decertification, the court engages in a more searching review. *Beauperthuy*, 772 F. Supp. 2d at 1117

26  (citing *Leuthold*).  Like the first stage, the decision to decertify a conditionally certified collective

27  action is within the court's discretion. *Id*. at 1118.

28

M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950

LONG BEACH, CALIFORNIA  90831

TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1   Under the second stage, in order to overcome a motion to decertify, it is the plaintiffs' burden

2   to provide substantial evidence to demonstrate that they are similarly situated. *Beauperthuy*, 772 F.

3   Supp. 2d at 1117 (citing *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010). Deciding

4   whether to decertify a conditionally certified collective action requires the court to weigh various

5   factors that require a fact-specific inquiry. *Id*. These factors include: (1) the disparate factual and

6   employment settings of the individual plaintiffs; (2) the various defenses available with respect to the

7   individual plaintiffs; and (3) fairness and procedural considerations. *Id*.

8   In making this evaluation, logically, the more material distinctions revealed by the evidence,

9   the more likely the district court is to decertify the collective action. *Beauperthuy*, 772 F. Supp. 2d at

10  1118 (citing *Anderson v. Cagle*, 488 F.3d 945 (11th Cir. 2007). District courts in the Ninth Circuit

11  have found that decertification is appropriate in the absence of proof that the plaintiffs' alleged

12  injuries resulted from a single, unified policy. *Id*. Ultimately, the decision whether to proceed as a

13  collective action turns on whether this device is the superior way to resolve a controversy, and the

14  benefits to the parties need to be balanced against prejudice to the defendant and judicial

15  administration problems. *Id*.

16  **V.   ARGUMENT**

17  **A.   Different Factual Settings Favor Decertification**

18  Holiday's Executive Chefs work in varying factual settings. The first factor courts analyze in

19  determining whether to decertify a collective action is the degree of similarity among plaintiffs'

20  factual and employment settings. *Beauperthuy*, 772 F.Supp.2d at 1122. When conducting this inquiry,

21  courts consider such factors as whether plaintiffs had differing job duties, worked in different

22  geographic locations, worked under different supervisors, or allege different types of unlawful

23  conduct. *Id* (collecting cases.). In other words, decertification is appropriate where plaintiffs are

24  subject to varying working conditions in different work locations or under different supervisors. *Id*.

25  And importantly, courts also evaluate whether plaintiffs have provided substantial evidence that their

26  claims arise out of a single policy, custom, or practice that led to FLSA violations. *Id*.

27  *Beauperthuy* provides an example in an exempt status context. In that case, the plaintiffs made

28  FLSA collective action claims against their employer alleging that personal trainers and fitness club

13

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION                4:14-CV-4495 PJH
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1    general managers were owed overtime, which the court conditionally certified. *Beauperthuy*, 772 F.

2    Supp. 2d at 1116-17, 1121, 1128. The employer moved to decertify both collectives pointing out the

3    different job duties among the trainer class, different managers, and different manager decisions.  The

4    employer established that the plaintiffs did not have substantial evidence of requiring off-the-clock

5    work for the trainers or a policy of requiring non-exempt work. *Id*. at 1122-1125, 1128-1132. The

6    court concluded the first factor weighed in favor of decertification and decertified the collective.  *Id*. at

7    1125, 1132.

8         Similarly, in *Hernandez v. United Auto Credit Corp.*, 2010 WL 1337702 at *1 (N.D. Cal.

9    2010), the court decertified a conditionally certified collective of automobile financing employees

10   alleging that they were owed overtime because they were misclassified as exempt. In doing so, the

11   court noted that the employer provided substantial evidence that individuals had varying levels of

12   supervisory and managerial duties. *Id*. at *4. The court also observed that the actual work performed

13   by employees varied from branch to branch because of employee turnover.  It rejected the argument

14   that a uniform classification of employees as exempt establishes an unlawful policy because that

15   ignores the actual duties performed by the employees. *Id* at *4-5. Based on this evidence, the court

16   found that the first factor counseled in favor of decertification. *Id*.

17        *Hill v. R + L Carriers, Inc.*, 2011 WL 830546 at *1 (N.D. Cal. 2011), provides a final example

18   of where a court decertified a conditionally certified collective after finding disparate factual settings

19   among the employees. The plaintiffs alleged that certain truck dispatchers were owed overtime under

20   the FLSA based on misclassifying employees as exempt. *Id*. at *2. On the employer's motion to

21   decertify, the court observed differences between the levels of discretion exercised by the employees,

22   different amounts of reliance on company handbooks, supervisory duties, training responsibilities, and

23   hiring responsibilities. *Id*. at *4-5. The court also rejected the plaintiff's argument that "dispatching"

24   was the employees' primary duty given the differences in the duties and work settings, including the

25

26

27

28

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1    size of the location where the employee worked. *Id*. With these differences in mind, the court found

2    that the first factor weighed in favor of decertification. *Id*. at *4-7.[5]

3          Many different factual scenarios exist among the Executive Chefs. The experiences of

4    Executive Chefs vary by geography, regional management, community management, community size

5    and skill. These variances significantly impact how the Chefs do their jobs.

6          More specifically, the experiences among Executive Chefs differ in the following ways:

7    (1) scheduling kitchen staff; (2) training kitchen staff; (3) directing and planning work of subordinate

8    staff; (4) planning and controlling budgets; (5) menu planning; (6) purchase of materials (including

9    food and supplies); (7) level of supervision received by Executive Chefs (both locally and regionally);

10    (8) involvement and authority with respect to personnel management; (9) concurrent supervision with

11    respect to performing non-exempt duties; (10) time spent cooking vs. management duties; (11) levels

12    of discretion exercised (with respect to following guidelines, menu choices, and other managerial

13    tasks); and (12) education, training, and work experience.

14          Because of these differences, like *Beauperthuy*, *Hernandez*, and *Hill*, this factor favors

15    decertification. In addition, there is no evidence that Holiday has a uniform policy requiring Executive

16    Chefs primarily to perform non-exempt work. Therefore, the Court should grant Plaintiff's motion.

17    **B.    Individualized Exemption Defenses Favor Decertification**

18          The second factor courts consider on a decertification motion is whether the asserted defenses

19    that would require individualized proof. *Beauperthuy*, 772 F. Supp. 2d at 1132. In other words, the

20    court considers whether the potential defenses pertain to the opt-in class as a whole or whether

21    varying defenses will be raised with respect to each individual plaintiff. *Green v. Harbor Freight*

22    *Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012). Individualized defenses that inhibit the

23    efficiency of proceedings on a collective basis support decertification. *Id*. Notably, where significant

24    differences exist among the job duties of the putative class members, determining whether class

25
26    [5] Other cases in this District have come to the same conclusion when faced with a motion to decertify
      FLSA collectives alleging overtime violations based on alleged exempt status misclassification. *See*
27    *Santiago v. Amdocs, Inc.*, 2013 WL 5444324 at *5-8 (finding variance in class member job duties and
      the lack of a common policy causing the violation favored decertification).
28

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

1    members qualify for FLSA exemptions will necessitate an individualized inquiry into the

2    circumstances of each plaintiff. *Beauperthuy*, 772 F. Supp. 2d at 1133 (collecting cases). Several cases

3    from this district are instructive as to this factor.

4          First, in *Beatperthuy*, after the employer produced evidence among putative class members

5    alleged to have been misclassified as exempt from overtime, the court found that evaluating each

6    defense would require individualized inquiries. *Beauperthuy*, 772 F. Supp. 2d at 1133. In particular,

7    the court found that the class members could qualify for different exemptions because of varying job

8    duties among the putative class. *Id.* at 1032-33. As a result, the court found that representative

9    testimony would be inadequate to determine whether the plaintiffs were properly categorized as

10   exempt. *Id.* at 1133. The Court concluded that this factor weighed in favor of decertification because

11   the individualized inquiries as to the exemptions would make adjudication of the plaintiffs' claims on

12   common proof too difficult.  *Id.* at 1133-34.

13         *Santiago*, 2013 WL 5444324 at *6-8 is another case where a court found that the presence of

14   FLSA exemption defenses favored decertification. The employer moved for decertification and

15   produced evidence that the class members had varying job duties, employment settings and exercised

16   different amounts of independent judgment and discretion. *Id.* at *5. The court relied on *Beauperthuy*

17   and found that the court would be required to engage in individualized inquiries to determine whether

18   each class member was properly classified as exempt. *Id.* at *8. The court decertified the class. *Id.*

19         Similarly, *Hill*, 2011 WL 830546 at *7 provides a final example of a court in this district

20   finding that an evaluation of exempt status defenses required decertification. On a motion for

21   decertification, evidence was presented about the employees' varying duties and levels of independent

22   judgment and discretion. *Id.* at *4-6. Because of this evidence, the Court concluded that the

23   circumstances of each employee differed, including the levels of discretion exercised. Those

24   differences required individualized inquiries into the application of the executive and administrative

25   exemption defenses. *Id.* at *5-7.

26         Here, Holiday intends to assert the executive, administrative, and professional exemptions.

27   Holiday will also assert "tacking" as a defense. That is a term of art for the law which allows

28   combining aspects of  different exemptions together to form an exemption.  29 C.F.R. § 541.708.

GARCIA, ARTIGLIERE & MEDBY

ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

The ways Executive Chefs perform their job duties varies considerably based on a number of factors. And the variances among Executive Chef job duties indicates that some may qualify for more than one defense, such as the executive, administrative and/or professional exemptions. As such, like *Beauperthuy*, *Santiago*, and *Hill*, individualized inquiries are necessary to adjudicate these individual defenses.

**C.    Evaluating The Executive Exemption Requires Individualized Inquiries**

Under the FLSA, to qualify for the executive exemption, an employee must: (1) have a primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (2) customarily and regularly direct the work of two or more other employees; and (3) has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).[6] The Parties do not dispute whether the Executive Chefs meet the second factor.

**1.    Individualized Inquiries Are Required To Assess Whether Executive Chefs Have A Primary Duty Of Management**

Under the FLSA, the term "primary duty" is defined as:

. . . the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.   Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700 (a).

Generally, "management" includes, but is not limited to, activities such as:

interviewing, selecting, and training of employees; setting and adjusting their . . . hours of work; directing the work of employees; maintaining production . . . records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining

_____

[6] There is also a minimum salary requirement, which is not at issue here.  *See* 29 C.F.R. § 541.100(a).

M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1  the type of materials, supplies, machinery, equipment or tools to be used or

2  merchandise to be bought, stocked and sold; controlling the flow and distribution of

   materials or merchandise and supplies; providing for the safety and security of the

3  employees or the property; planning and controlling the budget; and monitoring or

   implementing legal compliance measures.

4  29 C.F.R. § 541.102.

5      Here, the variance among Executive Chefs with respect to their performance of management

6  duties requires an individualized inquiry into each Chef's circumstances to determine whether the

7  executive exemption applies. In particular, there are substantial variances in the areas of:  scheduling,

8  training, directing and planning work, budget work, menu planning, food and supply purchase, level

9  of supervision, personnel management, concurrent supervision while performing non-exempt duties,

10 and time spent cooking vs. management duties. Each of these areas are critical to determining whether

11 the exemption applies.

12     Because the differences in these areas require individual proof, this factor weighs in favor of

13 decertification. As a result, the Court should grant Plaintiffs' motion and decertify the collective.

14          **2.      Individualized Inquires Are Required To Assess Whether Executive Chefs**

15                 **Have The Ability To Make Personnel Decisions - Particular Weight**

16     Qualifying for the executive exemption requires that the employee have the authority to hire,

17 or fire other employees or whose suggestions and recommendation as to the hiring, firing,

18 advancement, promotion or any other status change of employees are given particular weight.  29

19 C.F.R. § 541.100(a). Determining whether a Chef's suggestion is given "particular weight" requires a

20 consideration of (1) whether it is part of the employee's job duties to make the suggestions; (2) the

21 frequency at which the employee makes those suggestions; and (3) the frequency that the employee's

22 recommendations are relied upon. *Id*. at § 541.105. No requirement exists that the employee have the

23 final authority over the status change or that their recommendation be deemed the most important in

24 making the decision. *Id*.

25     Here, there is a substantial amount of variation among the Executive Chefs' participation and

26 authority with respect to personnel management. Some make all the decisions. Others need approval

27 of a superior manager. Others involve additional people in their decisions.  Therefore, since individual

28 evaluations of this factor are necessary to determine whether Chefs meet the executive exemption, this

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA  90831
TELEPHONE (562) 216-5270  •  FACSIMILE (562) 216-5271

1  factor favors decertification.

2      **D.     Evaluating The Administrative Exemption Requires Individualized Inquiries**

3      Under the FLSA, employers are not required to pay overtime to any employee employed in a

4  bona fide administrative capacity. 29 U.S.C. § 213(a)(1). Under federal law, in addition to meeting a

5  salary requirement not at issue here, the term "employee employed in a bona fide administrative

6  capacity" means that the employee:

7      (1)    has a primary duty[7] of performing office or non-manual work directly related to the

8             management or general business operations of the employer or the employer's

9             customers; and

10     (2)    has a primary duty that includes the exercise of discretion and independent judgment

11            with respect to matters of significance.

12  29 C.F.R. § 541.200(a)(1)-(3).

13     The variance among the job duties of Executive Chefs on both of these issues means that

14  individualized inquiries are necessary to determine whether the defense applies.

15         **1.     Individualized Inquires Are Required To Determine Whether The**

16               **Employee Primarily Performs Administrative Duties**

17     The phrase "directly related to the management or general business operations" means an

18  employee must perform work directly related to assisting with the running or servicing of the

19  business. 29 C.F.R. § 541.201(a). This work includes, but is not limited to, work in functional areas

20  such as budgeting; quality control; purchasing; procurement; safety and health; personnel

21  management; human resources; legal and regulatory compliance; and similar activities. *Id*. at §

22  541.201(b). Employees may qualify for this exemption if their primary duty is the performance of

23  work directly related to the management of the employer's customers. *Id*. at § 541.201(c).

24     Similar to the executive exemption, Executive Chefs also engage in differing levels of

25  administrative duties. Chefs have divergent involvement in many administrative areas, including

26  ─────────────────

27  [7] The term "primary duty" under the administrative exemption has the same definition as it does for
the executive exemption.  29 C.F.R. § 541.700 (a).

28

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA  90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1   budgeting, purchasing, food quality, and personnel issues. Because of this fluctuation, assessing the

2   application of the administrative exemption requires individual proof. Therefore, this factor favors

3   decertification and the Court should grant Plaintiffs' motion.

4   **2.      Individualized Inquiries Are Required To Determine Whether Executive**

5   **Chefs Exercise Independent Judgment And Discretion**

6   Exercising discretion and independent judgment in matters of significance involves the

7   comparison and evaluation of possible courses of conduct, and acting or making a decision after the

8   various possibilities have been considered. 29 C.F.R. § 541.202(a). The term "matters of significance"

9   refers to the level of importance or consequence of the work performed. *Id*.

10   In particular, determining whether an employee meets this test involves, among other things a

11   consideration of:

12   -   whether the employee can formulate, affect, interpret, or implement management
13       policies or operating practices;

14   -   whether the employee carries out major assignments in conducting the operations of
         the business;

15   -   whether the employee performs work that affects business operations to a substantial
16       degree, even if the employee's assignments are related to operation of a particular
         segment of the business;

17   -   whether the employee performs work that affects business operations to a substantial
18       degree;

19   -   whether the employee has authority to commit the employer in matters that have
         significant financial impact;

20   -   whether the employee has authority to negotiate and bind the company on significant
21       matters; and

22   -   whether the employee provides consultation or expert advice to management.

23   29 C.F.R. § 541.202(b).

24   In sum, exercising discretion implies that the employee can make an independent choice free

25   from immediate direction and supervision, but they can still exercise discretion despite having their

26   decisions reviewed at a higher level.  29 C.F.R. § 541.202(c).

27   Here, determining whether executive Chefs customarily and regularly exercise sufficient

28   discretion and independent judgment requires evaluating the individual Chef's circumstances.

1    Executive Chefs use different levels of discretion in the areas of following company guidelines, menu

2    choices, budgeting, executing corporate menus to meet the unique dietary needs of seniors, personnel

3    management, training, staffing, and supply ordering. Much of this variation results from geography,

4    regional management, and community size. Because of these differences, determining whether the

5    Chef falls within the administrative exemption will require individualized inquiries. As a result, the

6    Court should grant Plaintiff's motion.

7         **E.**      **Evaluating The Professional Exemption Requires Individualized Inquiries**

8         Bona fide professional employees are also exempt from overtime. To qualify, the employee

9    must: (1) be compensated by a salary basis at a rate of not less than $455 per week; and (2) have a

10   primary duty that (a) requires knowledge of an advanced type in a field of learning customarily

11   acquired by a prolonged course of specialized intellectual instruction or (b) requiring invention,

12   imagination, originality or talent in a recognized field of artistic or creative endeavor. 29 C.F.R. §

13   541.300 (a).

14        Under this exemption, the term "primary duty" means that: (1) the employee must perform

15   work requiring advanced knowledge; (2) the advanced knowledge must be in a field of learning; and

16   (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized

17   intellectual instruction.  29 C.F.R. § 541.301(a).

18        "Work requiring advanced knowledge" means works that is predominantly intellectual in

19   character, which includes work requiring consistent exercise of discretion and judgment, as opposed to

20   routine manual or physical work. 29 C.F.R. § 541.301(b)  In other words, the work generally uses the

21   advanced knowledge to analyze, interpret or made deductions from varying facts and circumstances.

22   *Id*.

23        The term "field of science or learning" includes the traditional professions of law, medicine,

24   theology, accounting, actuarial computation, engineering, architecture, teaching, various types of

25   physical, chemical and biological sciences, pharmacy and other similar occupations that have a

26   recognized professional status. 29 C.F.R. § 541.301(c). The U.S. DOL agrees that Executive Chefs

27   who have attained a four-year specialized academic degree in a culinary arts program meet the duties

28   requirements for the learned professional program. 29 C.F.R. § 541.301(e)(6).

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

And the phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best *prima facie* evidence that an employee meets this requirement is possession of a four year academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through work experience and/or associate degrees. 29 C.F.R. § 541.301(d).

Here, individualized inquiries are required to determine whether Executive Chefs qualify for the exemption. For example, some Executive Chefs may or may not be able to qualify for the exemption with proof of their education. Others may or may not qualify with proof of their schooling and training. Still others will qualify through proof of their extensive work experience even absent formal education. All of these assessments will require individualized proof.

### F.   Evaluating The Tacking Defense Requires Individual Inquires

Employees who perform a combination of exempt duties under the executive, administrative, and professional exemptions may also qualify as exempt. 29 C.F.R. § 541.708. Thus, employees who primarily perform a combination of executive and administrative duties may be exempt. *Id*. Work that is exempt under one section does not defeat an exemption under any other section. *Id*. This defense is more commonly known as "tacking."

Here, the variances discussed above with respect to the job duties performed by Executive Chefs that impact the analysis under the other exemptions also impact the analysis as to whether "tacking" applies. Therefore, evaluating a "tacking" defense will require complicated and nuanced individualized inquiries. As a result, the Court should decertify the collective.

### G.   Fairness And Procedural Considerations Counsel Towards Decertification

The last factor courts evaluate on a motion for decertification is fairness and procedural considerations. *Beauperthuy*, 772 F. Supp. 2d at 1118. In evaluating this factor, courts must consider the primary objective of a collective action: (1) to lower costs to the plaintiffs through pooling of resources and (2) to limit the controversy to one proceeding which efficiently adjudicates common

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

1    issues of law and fact.  *Id.* at 1127.  Courts must also determine whether it can coherently manage the

2    class in a manner that will not prejudice any party.  *Id.*

3        In other words, the court must balance the benefits of a reduction in the cost to individual

4    plaintiffs and any increased judicial utility that may result from the resolution of many claims in one

5    proceeding with the cost of any potential detriment to the defendant and the potential for judicial

6    inefficiency that could stem from collective treatment. *Beauperthuy*, 772 F. Supp. 2d at 1118.  The

7    need for individual determinations on defenses, such as FLSA exemption defenses, favors

8    decertification as it does not promote an efficient resolution.  *Beauperthuy*, 772 F. Supp. 2d at 1134;

9    *Hernandez*, 2010 WL 1337702 at *5.

10       Here, given the myriad experiences of Executive Chefs and variances with respect to the duties

11   performed by each Chef, this factor favors decertification. The variety of job duties, educational

12   backgrounds, and the potential application of several FLSA exemption defenses indicate that

13   individualized inquiries would be necessary to adjudicate this matter. It would be inefficient and

14   unfairly prejudicial to both individual plaintiffs and to Holiday (not to mention the Court) because it

15   could confuse the issues for the fact finder and require mini trials for each Executive Chef. As such,

16   collective treatment is not appropriate.

17       Moreover, additional considerations counsel towards decertification. For example, although 62

18   Executive Chefs filed timely opt-in notices, only 14 can participate (including Plaintiffs) in this

19   collective action because of arbitration agreements or prior settlement agreements containing

20   collective action waivers. Of those Executive Chefs that can participate, only 2 are from California

21   and 12 are from other states across the country. Given the small collective of Executive Chefs that can

22   actually participate, judicial efficiency would not be served by proceeding as a nationwide collective,

23   especially given the factual differences amongst the Executive Chefs and their ability to bring their

24   claims in individual arbitration in a forum closer to home.  The Court should grant the motion for

25   decertification.

26   VI.    **CONCLUSION**

27       The Court should decertify the conditionally certified FLSA collective. There are many

28   material differences in the factual scenarios that apply to each Executive Chefs. These variances

GARCIA, ARTIGLIERE & MEDBY
ONE WORLD TRADE CENTER, SUITE 1950
LONG BEACH, CALIFORNIA 90831
TELEPHONE (562) 216-5270 • FACSIMILE (562) 216-5271

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx

1  require an individual analysis as to whether the executive, administrative, or professional exemptions

2  apply. Because of these differences and only a small number of Executive Chefs that can participate,

3  maintaining a collective action would not be efficient and could potentially prejudice Holiday's

4  defense. The Court should grant Plaintiffs' motion.

5

6  DATED: June 24, 2016                    **GARCIA, ARTIGLIERE & MEDBY**

7

8

9                                         By:    /s/ David M. Medby

10                                              Stephen M. Garcia
                                                David M. Medby
11                                              Attorneys for Plaintiff and Proposed Class Members

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION                 4:14-CV-4495 PJH
M:\Shaia, Tara - Harvest Management (14-099)\Decertification\Mtn.Decertification.docx